19-MJ-5290-JGD

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Patrick Briody, being duly sworn, depose and state that:

## INTRODUCTION

1.I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since 2010. I am currently assigned to the Bridgewater, Massachusetts, ATF Field Office. During my law enforcement career, I have participated in many investigations involving firearm and drug trafficking and related crimes. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants including obtaining cellular smartphone data that assisted in identifying and prosecuting offenders.

2.Based on my training and experience as a Special Agent, I am familiar with the federal laws regarding narcotics. I know that it is a violation of 21 U.S.C. § 841(a)(1) to distribute or possess with intent to distribute controlled substances, including fentanyl and cocaine.

3.I am currently investigating Roosevelt WILKINS for violations of 21 U.S.C. § 841(a)(1), possession with intent to distribute controlled substances, including fentanyl and cocaine (the "Target Offenses").

4.I submit this affidavit in support of an application to search a cellular smartphone telephone – a black iPhone XS, Model: A1920, IMEI: 357206096740529 – seized from Roosevelt WILKINS incident to his arrest by ATF on October 18, 2019 (hereinafter, the "**TARGET DEVICE**"). ATF possesses the device at the location described in Attachment A. For the reasons stated below, there is probable cause to believe that the **TARGET DEVICE**

described in Attachment A contains evidence, fruits, and instrumentalities of the Target Offenses as described in Attachment B.

5. The facts in this affidavit come from my personal observations, my training and experience and information obtained from other law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Probable Cause to Believe That a Federal Crime Was Committed

6. On April 1, 2019 at about 5:45 P.M., Massachusetts State Police (MSP) Trooper Edward Alldredge and Trooper Michael Finley were monitoring traffic on the ramp from Route 24 to Route 27 in Brockton, MA, when they observed the operator of a black sedan pass them while looking at his phone in his hand as if he was texting. The vehicle then entered Route 27 without slowing down or using his left turn signal causing vehicles to slow down.

7. MSP conducted a traffic stop during which Trooper Alldredge detected the smell of burnt marijuana emanating from the interior of the vehicle. Trooper Alldredge recognized the operator to be Roosevelt WILKINS from a prior interaction and observed his hand to be shaking rapidly but his movements to be slow and lethargic. WILKINS had bloodshot and glassy eyes with dilated pupils and a white film in the corners of his mouth. When asked to provide a driver's license, WILKINS first handed Trooper Alldredge a female's identification prior to providing his own. Trooper Alldredge asked WILKINS if he had been smoking marijuana, which he denied. At this time Trooper Alldredge observed WILKINS's chest beginning to rise rapidly as if WILKINS was beginning to breathe heavily. Trooper Alldredge also noticed that WILKINS's speech was slurred. Trooper Alldredge asked WILKINS to step out of the vehicle

so that he could conduct road side assessments.

8. WILKINS stepped out slowly, then pushed Trooper Alldredge and began to flee on foot, running across four lanes of traffic. While chasing WILKINS, Trooper Alldredge ordered WILKINS to stop and that he was under arrest, but WILKINS did not stop. Trooper Alldredge observed that WILKINS was running with a hand continuously on his front waist band as if holding an object in his pants. In front of 70 Westgate Drive, Trooper Alldredge observed WILKINS lean over and make a motion in front of a gray sedan as if he was throwing something under the front of the vehicle. WILKINS then began to slow down and walk before surrendering and being placed under arrest.

9. Following the arrest of WILKINS, Trooper Alldredge walked back towards the gray sedan. A male party in a Jeep pulled up and told Trooper Alldredge, "I saw him throw something under that gray vehicle next to the black Nissan," before driving away. Trooper Alldredge observed that the gray sedan he had seen WILKINS make the tossing motion under was parked next to a black Nissan. Trooper Alldredge then recovered a plastic bag containing multiple plastic bags of off-white and brown powder from under the gray sedan.

10. Troopers than conducted an inventory search of WILKINS's vehicle prior to tow. They located and recovered a money counter, an iPhone, and an LG cellular phone.

11. On April 5, 2019, Trooper Alldredge applied for and obtained Falmouth District Court search warrant 1989SW028 to obtain the contents of the two cellular phones. Trooper John Santos executed this warrant on April 6, 2019. The examination was successful on the LG cellular phone.

12. On August 13, 2019, I reviewed the contents of the LG cellular phone recovered from WILKINS on April 1, 2019.

13.     Specifically, I reviewed text messages with phone number 508-776-0354 that was saved as contact name "Jermaine." A series of texts between WILKINS's phone number and Jermaine's beginning on March 31, 2019 reads as follows:

> JERMAINE: If you can cut it for me we can do it in the morning
> WILKINS: OK cool
> JERMAINE: i need 5 on it
> WILKINS: Huh
> JERMAINE: i need you to cut it with 5 grams
> WILKINS: Cut what?
> JERMAINE: Because I'm trying to make up for the other ones he said we're short"
> WILKINS: Ok
> JERMAINE: I'll just come up there after work

14.     On April 1, 2019, the conversation between Jermaine and WILKINS resumes beginning at 10:15 AM as follows:

> JERMAINE: Today 4:30 stop nd shop is that cool
> WILKINS: Ok

Based on my training and experience, I interpret this text message string between Jermaine and WILKINS to mean that WILKINS was setting up a drug deal with Jermaine for April 1 at or around 4:30 PM.

15.     Around 12:30 to 12:45 PM on April 1, 2019, WILKINS receives a series of messages from 857-246-0782: "Yo New number," "Dunny," "U want 20/60 right." WILKINS then replies "Yea" and "How long." Dunny replies, "Bout to leave law town so give me like hour - hour n a half." WILKIN acknowledges, "Ight coo." At 2:14 PM, WILKINS checks in, "How we lookin," "Let me know I got my ppl at bay." The conversation goes back and forth about when and where to meet. At 3:26 PM WILKINS says, "How long my ppl bout to leave they can't wait no longer." After Dunny suggests he will be a half an hour, WILKINS objects that will be too long. Again at 3:41 PM, WILKINS says, "How long will you be to me." At 4:21 PM, Dunny responds, "10 min" and at 4:34 PM says, "Here." Based on my training and

experience, I interpret the text message string between WILKINS and Dunny to mean that WILKINS was setting up a meeting with Dunny in order to buy a quantity of narcotics from Dunny at or around 4:35 PM on April 1.

16. On that same date, call logs reveal that, after the apparent meet-up between WILKINS and Dunny, at about 5:00 PM, WILKINS receives a call from Jermaine that lasts about 18 seconds. At 5:19 PM, WILKINS texts Jermaine, "Walk in Shaws bathroom 10 mins," to which Jermaine replies at 5:32 PM, "I'm in here." At 5:32 PM WILKINS writes, "Ok I'm down the road." At 5:41 PM, Jermaine says, "Yo," to which WILKINS replies at 5:43 PM, "Bro I'm parking lol." This was the last message that WILKINS sent on the phone; he was stopped by the MSP at approximately 5:45 PM. Based on my training and experience, I interpret this text message string to mean that WILKINS was setting up a meeting with Jermaine to sell a quantity of narcotics in the Stop and Shop bathroom at or around 5:45 PM on April 1, 2019.

17. On September 23, 2019, the MSP Crime Laboratory issued a Certificate of Analysis indicating that the bag seized from under the gray sedan on April 1, 2019, contained 16 knotted plastic bags containing tan powder. The contents of 15 of these bags were weighed and tested, and each found to contain a mixture including a detectable amount of fentanyl. The weight of the tested powder was 70.25 grams.

**Investigators' Possession of the TARGET DEVICE**

18. On October 17, 2019, the defendant was federally indicted for possession with intent to distribute fentanyl, and an arrest warrant was issued in United States District Court for the District of Massachusetts case number 19cr10401.

19. On October 18, 2019, in Canton, MA, I observed WILKINS get into the front passenger seat of a gray Honda Accord bearing Massachusetts registration number 1LFZ77. I

conducted a vehicle registration check and learned the vehicle was registered to WILKINS's last known girlfriend Sophia Thomas. A traffic stop was conducted on a public way in Stoughton, MA and WILKINS was advised of the warrant and taken into custody. At this time, agents located and recovered the **TARGET DEVICE** from WILKINS's person. WILKINS's body, but not his shoes, was searched for weapons, and he was placed into a marked Stoughton Police Department cruiser for transport to the police station.

20. During transport, Officer Michael Cowgill noticed WILKINS continuously hitting his feet against the back of the front passenger seat and moving around. Upon arrival at the Stoughton Police Department, Officer Cowgill brought WILKINS into the booking area and noticed that WILKINS's shoes were untied. Officer Cowgill immediately searched the prisoner compartment of his cruiser and found two plastic-wrapped packages containing multiple baggies of brown and white powdery substances. The items were located in the bottom portion of the compartment where WILKINS's feet were located. That compartment had been searched prior to police placing WILKINS in the cruiser and there had been no contraband present.

21. The substances seized from the prisoner compartment of the cruiser were sent to the Drug Enforcement Administration lab for testing. The DEA reported that the packages contained 7 smaller plastic bags containing powder substance. Six of these bags contained a detectable amount of fentanyl; the weight of the tested powder in those bags was 30.1 grams. The seventh bag contained a detectable amount of cocaine. The weight of the powder in that bag was 3.476 grams.

22. During transport to WILKINS's initial appearance WILKINS stated that he was "BROMLEY-HEATH" indicating that he was member of the Boston based Heath Street Gang.

**Probable Cause to Believe that the TARGET DEVICE Contains Evidence, Fruits, and Instrumentalities of the Target Offenses**

23. As discussed above, the **TARGET DEVICE** is currently stored at the ATF Bridgewater Field Office, One Lakeshore Center, Room 201, Bridgewater, MA. From my training and experience and the training and experience of law enforcement personnel who routinely handle electronic equipment, I understand that the equipment has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the equipment first came into the investigators' possession.

24. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones including the **TARGET DEVICE** seized here, can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

25. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

26. From my training and experience, and information provided to me by other law enforcement officers, I am aware that individuals frequently use computer equipment (including smartphones) to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving email, text messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching the internet for information, including

information regarding travel and activities; accessing personal accounts, including banking information; paying for items; and creating and storing images and videos of their movements and activities.

27. Based on my training and experience, I know that often criminals use their cell phones to keep in contact with customers and suppliers through calls, texts and social media; to place orders; and to take and send pictures of their products to potential customers. Criminals involved with narcotics and criminal organizations also take, store, and share photos and videos of themselves with narcotics, firearms and other gang members.

28. I believe that the **TARGET DEVICE** will likely contain evidence of WILKINS's possession with intent to distribute a controlled substance, including but not limited to communications between WILKINS and other persons about the acquisition, transportation, possession, use, and sale or disposition of controlled substances, including the controlled substances he was found in possession of on October 18, 2019.

29. Also, based on the facts developed during this investigation and on my training and experience, I believe that historical location data contained within the **TARGET DEVICE** will assist investigators in learning about the acquisition, transportation, storage, possession, and sale of controlled substances by WILKINS and co-conspirators, and about the locations at which such activity occurs.

30. Based on my knowledge, training, and experience and information provided to me by other law enforcement officers, I know that data often can be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they

can easily transfer the data from their old device to a new one.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

31. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) have been committed by Roosevelt WILKINS.

32. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the property described in Attachment A.

Respectfully submitted,

*/s/ Patrick J. Briody*

Patrick J. Briody, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to before me this 26th day of November, 2019.

*/s/ Judith Gail Dein*

HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS